UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 08-22333-CIV-LENARD
MAGISTRATE JUDGE P. A. WHITE

RODNEY THOMAS,                    :

        Plaintiff,               :

v.                               :                    REPORT OF
                                             MAGISTRATE JUDGE
GISELA PICHARDO, et al., :

        Defendants.              :
_____

## I   INTRODUCTION

This pro se civil rights action brought by plaintiff Rodney
Thomas has had a somewhat tortuous procedural history, with the
filing of an initial complaint (DE#1), an amended complaint (DE#
14), and a superseding second amended complaint (DE#49), complain-
ing of events that occurred in 2008-09 at Everglades C.I. ("ECI").

Thomas' initial pleading (DE#1, signed/filed on 8/18/08, and
docketed on 8/21/08)[1] was submitted on a standard form intended for
use by inmates to bring civil rights actions pursuant to 42 U.S.C.
§1983. In the style and body of the pleading DE#1 Thomas wrote and
then deleted ("X-ed out") the name of Carl Balmir, a Doctor who is
Chief Health Officer ("CHO") at ECI. He named four ECI defendants:
the warden (Gisela Pichardo), two correctional officers (Jeffrey
Johnston and Iriberto Rosado) and the food service director (Dora
Jurado), raising allegations in a narrative form that complained
about medical care and food, and appeared to complain about the
prison disciplinary process. Because his narrative lacked specifics
of how each named defendant allegedly violated his rights, Thomas
was Ordered to file an amended complaint by November 7, 2008 (Order
DE#7). After an extension of time was granted, Thomas submitted an
entirely handwritten amended complaint (DE#14, signed/filed January

---

[1]       It is well settled that the date when a pro se prisoner's pleading
is file stamped at the court is not the filing date. In Houston v. Lack, 487 U.S.
266 (1988) the Supreme Court established the principle that a pro se petitioner's
notice of appeal is deemed filed on the date that it is delivered to prison
authorities for mailing. Later, in Garvey v. Vaughn, 993 F.2d 776 (11 Cir. 1993)
the Eleventh Circuit extended the Houston principle to Federal Tort Claims Act
and 42 U.S.C. §1983 pro se prisoner complaints, holding that such complaints are
deemed to be filed when they are delivered to prison authorities for mailing.

20, and docketed January 23, 2009) invoking 42 U.S.C. §1983, and
mentioning the "ADA" (i.e., the Americans with Disabilities Act).

In the First Amended Complaint Thomas designated the 4 defen-
dants who were named in the original complaint, included CHO Balmir
who had been removed from the initial pleading, and added a second
sergeant as a new defendant. Thus, in the First Amended Complaint
(DE#14) plaintiff Thomas sought to sue six defendants, all at ECI:

1.   Warden Gisela Pichardo
2.   Captain Jeffrey Johnston
3.   Sergeant Eriberto Rosado
4.   Sergeant Juan Martell
5.   Dr. Carl Balmir (ECI's CHO, from Prison Health Services)
6.   Dora Jurado (ECI's Food Service Director, from Trinity Food Service)

Thomas claimed his Eighth Amendment rights were violated, bas-
ed on alleged failure to provide medications and a special diet
that he needed due to a kidney condition (referred to by him as a
"pre-dialysis" diet). He alleged that as a result of discussions he
had with officers about food trays that were provided to him, one
officer made a derogatory comment (that plaintiff's medical condi-
tion was like "aids"); and he alleged that he received three false
prison Disciplinary Reports ("DRs"), all of which Thomas explicitly
claimed were lodged by the charging officers in retaliation because
he had named them as defendants in the initial complaint in this
case. Upon review of the Amended Complaint, a Preliminary Report
(DE#16) was entered. In connection with the alleged false DRs, the
pleading was construed to raise not only the claim of retaliation
(based on violation of the First Amendment), but also a claim that
Thomas had been denied due process in the prison disciplinary
proceedings. The Report also addressed plaintiff's attempt to raise
claims based on supervisory liability, in relation to circumstances
of the disciplinary proceedings, and provision of medications and
food. Lastly, there was Thomas' invocation of the ADA. The Preli-
minary Report (DE#16) recommended on February 20, 2009, for reasons
discussed therein, that where the amended complaint had "raised
minimal facts to state a possible First Amendment claim against

2

Martell, Johnston and Pichardo," it should be allowed to go forward against them solely on the claim of alleged unconstitutional retaliation (i.e. issuance false DRs as retaliation). The Report recommended that as to all other claims and defendants the complaint be dismissed pursuant to 28 U.S.C. §1915(e)(2)(B)(ii), for failure to state a claim upon which relief may be granted.

In conjunction with the Preliminary Report, summonses were issued (DE#s 18-20). The Marshal was directed to serve process upon Martell, Johnston, and Pichardo (DE#15). Service for Rosado, Balmir and Jurado was not ordered due to the recommendation that, as to them, all claims in the amended complaint should be dismissed. Martell, Johnston and Pichardo were served and filed a joint Answer (DE#s 23-26). The parties engaged in discovery, and 5 months after entry of the Preliminary Report (DE#16) plaintiff Thomas submitted a Second Amended Complaint (DE#49, signed/filed July 29; docketed July 31, 2009). On August 7, 2009, an Order (DE#52) was entered denying the Preliminary Report DE#16, as moot, in light of the filing of the Second Amended Complaint. Pichardo, Johnston and Martell filed an Answer to the second amended pleading (DE#54), and the parties engaged in additional discovery.

No Supplemental Preliminary Report was entered. Martell, Johnston and Pichardo sought clarification (DE#62), stating their belief that only 1 claim (retaliation) was pending against them, and sought to clarify what other issues if any remained in the Second Amended Complaint that they should address. An Order was entered (DE#68) stating that the retaliation claim remained against the three defendants; and that the deadline for their filing of a motion for summary judgment was extended to November 20, 2009.

## II   MATTERS NOW PENDING BEFORE THE COURT

**This Cause is now before the Court upon a Motion for Summary Judgment (DE#78) filed jointly by the defendants Pichardo, Johnston and Martell,** with 28 supporting exhibits (DE#s 78-1 to 78-28), addressing the Retaliation claim raised against them in the Second Amended Complaint. Plaintiff Thomas was advised of his right to

oppose the defendants' motion (DE#80, Order of Instructions);[2] and

---

[2]      Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is proper

> [i]f the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.

In <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986), the Court held that summary judgment should be entered only against

> a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.  (citations omitted)

Thus, in <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986), the Court held that summary judgment should be entered only against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.  The moving party is 'entitled to judgment as a matter of law' because the non-moving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. (citations omitted). Thus, pursuant to <u>Celotex</u> and its progeny, a movant for summary judgment bears the initial responsibility of informing the court of the basis for his motion by identifying those parts of the record that demonstrate the nonexistence of a genuine issue of material fact. This demonstration need not be accompanied by affidavits. <u>Hoffman v. Allied Corp.</u>, 912 F.2d 1379, 1382 (11 Cir.1990).If the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party, to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence. <u>Avirgan v. Hull</u>, 932 F.2d 1572, 1577 (11 Cir.), <u>cert. denied</u>, 112 S.Ct. 913 (1992). It is the nonmoving party's burden to come forward with evidence on each essential element of his claim sufficient to sustain a jury verdict. <u>Earley v. Champion International Corp.</u>, 907 F.2d 1077, 1080 11 Cir.1990). The non-moving party cannot rely solely on his complaint and other initial pleadings to contest a motion for summary judgment supported by evidentiary material, but must respond with affidavits, depositions, or otherwise to show that there are material issues of fact which require a trial <u>Fed.R.Civ.P.</u> 56(e); <u>Coleman v. Smith</u>, 828 F.2d 714, 717 (11 Cir.1987). If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment may be granted. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986); <u>Baldwin County, Alabama v. Purcell Corp.</u>, 971 F.2d 1558 (11 Cir.1992). "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." <u>Walker v. Darby</u>, 911 F.2d 1573, 1577 (11 Cir. 1990) (citing <u>Anderson v. Liberty Lobby, Inc.</u>, <u>supra</u>).

Pursuant to <u>Brown v. Shinbaum</u>, 828 F.2d 707 (11 Cir. 1987), the Order of Instructions (DE# 80) was entered to inform the plaintiff Thomas, as *pro se* litigant, of his right to oppose the motion for summary judgment filed by

he Responded with a Declaration (DE#84), a Declaration/Response (DE#88), and a statement of disputed facts and supplement thereto (DE#s 89, 91). The defendants filed Replies (DE#s 90, 93). Thomas sought and was granted leave to further supplement his statement of facts (Motion DE#92, Order DE#95). Thomas sought to compel release to him of copies of his medical records (DE#96), defendants filed a Notice of Compliance (DE#98). Two months later, in April 2010, Thomas complained he had not received the copies (DE#100), and defendants filed a Response (DE#101) indicating that the records had been released in February 2010. To their April Response DE#101 (a copy of which was served on the plaintiff) the defendants attached copies of the medical records they had previously released to him in February. Plaintiff Thomas has filed nothing more in the case.

**This Cause is also before the Court for a Report screening all claims in the Second Amended Complaint, apart from the Retaliation addressed in the Summary Judgment Motion DE#72.** These are claims against served defendants [Pichardo, Johnston, Martell]; claims against un-served defendants [Rosado, Balmir and Jurado named in the First and Second Amended Complaints]; and claims against defendants sued only in the Second Amended Complaint [5 named defendants, and John Does].

The defendants designated in the Second Amended Complaint are:

1.   Warden Gisela Pichardo
2.   Captain Jeffrey Johnston
3.   Sergeant Eriberto Rosado
4.   Sergeant Juan Martell
5.   Dr. Carl Balmir (the Chief Health Officer at ECI)
6.   Dora Jurado (the Food Service Director at ECI)
7.   Susan Moles
8.   Clifford Beck
9.   Alix Lafond
10.   Alonzo Perkinds
11.   Blondell Tate
12.   Defendants John Doe

--------

defendants in the case, and to instruct the plaintiff regarding the requirements under Fed.R.Civ.P. 56 for a proper response to such a motion.

### III. SUMMARY JUDGMENT MOTION (DE#78) FILED JOINTLY BY DEFENDANTS PICHARDO, JOHNSTON AND MARTELL, IN RESPONSE TO THE CLAIM OF ALLEGED RETALIATORY DISCIPLINARY REPORTS

As noted in the Preliminary Report (DE#16), plaintiff Thomas alleged in the First Amended Complaint (DE#14) that three DRs issued and/or approved by Martell, Johnston and Pichardo were lodged against him as retaliation for his filing of this lawsuit. These DRs, all issued in October 2008, were for Disorderly Conduct; and making a Spoken Threat, and Disrespect.

This same retaliation claim regarding the same three DRs was raised by Thomas in his Second Amended Complaint (DE#49), and has been responded to by the defendants Martell, Johnston and Pichardo in their Motion for Summary Judgment (DE#78).

#### A. Law Pertaining to Prisoner Retaliation Claims

Claims that prison officials have retaliated against an inmate for exercising free speech, or filing lawsuits or administrative grievances, are cognizable in a civil rights suit for damages. Thomas v. Evans, 880 F.2d 1235, 1242 (11 Cir. 1989)(First Amendment forbids retaliation against prisoners for exercising right of free speech; Adams v. Wainwright, 875 F.2d 1536 (11 Cir.1989)(retaliation for filing lawsuits); Wildberger v. Bracknell, 869 F.2d 1467 (11 Cir.1989) (retaliation for filing administrative grievances).[3] To

---

[3]      In the "free world" context, an act taken in retaliation for exercise of a constitutionally protected right is actionable under §1983 even if the act, when taken for different reasons, would have been proper. Adams v. James, 797 F.Supp. 940, 948 (M.D.Fla. 1992) (citing Mount Healthy City School Dist. Bd. of Education v. Doyle, 429 U.S. 274, 283 (1977). A claim of retaliation is a question of causation, and the test applied in the "free world" context is a "but for" analysis. Adams v. James, supra, 797 F.Supp. at 948. See: Mount Healthy City School Dist. Bd. of Education v. Doyle, 429 U.S. 274 (1977) ("but for" the retaliatory motive, the incidents to which the plaintiff refers would not have taken place). In the prison context at least one Circuit has applied the "but for" standard to inmate claims of retaliation. See: McDonald v. Hall, 610 F.2d 16, 18 (1 Cir. 1979). The Eleventh Circuit, however, has declined to follow the "but for" analysis in the context of prisoner retaliation suits, "to the extent that the 'but for' test places a greater burden of proof on the inmate." Adams v. Wainwright, supra, 875 F.2d at 1537; Adams v. James, supra, 797 F.Supp. at 948. Instead, the analysis applied in this Circuit to a prisoner retaliation claim requires a "mutual accommodation" between the penal institution's legitimate needs and goals and the prisoner's retained constitutional rights, under the "reasonableness" test set forth in Turner v. Safley, 482 U.S. 78

establish a claim for retaliation, the inmate must show a causal connection between his protected conduct and the harm complained of. Farrow v. West, 320 F.3d 1235, 1248-49 (11 Cir. 2003). A prisoner retaliation claim must be factual, and mere conclusory allegations of unconstitutional retaliation will not suffice. Adams v. James, supra, 797 F.Supp. at 948 (citing Frazier v. Dubois, 922 F.2d 560, 562 n. 1 (10 Cir. 1990). See Cooper v. Ellsworth Correctional Work Facility, 817 F.Supp. 84, 86 (D.Kan.), aff'd, 2 F.3d 1160 (10 Cir. 1993), and cases cited therein.

Upon consideration of a motion for summary judgment, mere verification of a party's own conclusory allegations is not sufficient to oppose the motion for summary judgment, Adams v. James, 797 F.Supp. 940, 944 (M.D.Fla. 1992) (citing Fed.R.Civ.P. 56(e); and Fullman v. Graddick, 739 F.2d 553, 557 (11 Cir. 1984)).   An essential element of a First Amendment retaliation claim is existence of a retaliatory motive. See Gattis v. Brice, 136 F.3d 724, 726 (11 Cir. 2003) ("To succeed in a section 1983 suit based on a claim of retaliation for speech, the plaintiff must show that his speech was a 'substantial' or 'motivating' factor in the allegedly retaliatory decision"). Mere "general attacks" upon a defendant's motivations are not enough, and the plaintiff must articulate "affirmative evidence" of retaliation to prove the requisite motive. Crawford-El v. Britton, 523 U.S. 574, 600 (1998)(citations omitted). In essence, the plaintiff must be able to establish that a defendant was "subjectively motivated to discipline" him for exercising his First Amendment rights. Smith v. Mosely, 523 F.3d 1270, 1278 (11 Cir. 2008). Courts are not to infer causation or construe legal conclusions as facts, Aldana v. Del Monte Fresh Produce, N.A., Inc., 416 F.3d 1242, 1248-49 (11 Cir. 2005); and further, courts should give deference to prison officials when evaluating whether there were legitimate penological reasons for conduct alleged to be retaliatory. Sandin v. Conner, 515 U.S. 472 (1995).

---

(1987). Adams, supra, at 948.

Moreover, an inmate cannot state a claim for retaliatory disciplinary proceedings where "the discipline [was] imparted for acts that a prisoner was not entitled to perform." See Cowans v. Warren, 150 F.3d 910, 912 (8 Cir. 1998) (quoting Orebaugh v. Caspari, 910 F2d 526, 528 (8 Cir. 1990)); O'Bryant v. Finch, No. 5:05cv11/LAC/MD., 2008 WL 691689, at *9 (N.D.Fla. Mar.12, 2008).

## B. Discussion

### 1. The Defendants' Arguments/Defenses Raised on Summary Judgment

The defendants argue that with regard to the three October 2008 DRs in question there was no First Amendment violation (based on issuance of alleged retaliatory DRs), and that they are entitled to qualified immunity. They argue that to the extent Plaintiff Thomas was deprived of gain time due to one of the "DRs," his complaint is barred under Heck v. Humphrey, 512 U.S. 477 (1994). The defendants argue that as to his Retaliation claim Thomas did not exhaust his available administrative remedies before bringing suit in federal Court, as required by the Prison Litigation Reform Act of 1995 ("PLRA") pursuant to 42 U.S.C. §1997e(a). They further argue that the plaintiff cannot recover punitive damages; and that when sued in their official capacities they are immune from suit for damages.

### 2. Plaintiff Thomas' Allegations

In his Second Amended Complaint (DE#49) Thomas, in pertinent part, alleges the following. On August 21, 2008 he filed his "initial pro se civil rights complaint pursuant to 42 U.S.C. §1983, naming as defendants the warden, three correctional officers, one PHS employee, and one TFS employee." (DE#49, ¶31). In that paragraph (¶31) Thomas does not reference the identities of the defendants whom he named/sued in the original complaint. [They included only Pichardo, Johnston, Rosado, and Jurado. See DE#1].

### The Plaintiff's Allegations Concerning The 10/6/08 DR for "Disorderly Conduct;" Claims Against Martell and Johnston

Thomas alleges that at supper on October 6, 2008 he told a TFS [Trinity Food Service] worker that he wanted to see the diet menu because he believed the portions of food on his tray were too small. Plaintiff Thomas (citing his own Exhibit C to DE#49 as proof) alleges that due to his (Thomas') own actions, Sgt. Martell who was supervising inmate feeding, took him to Captain Johnston, who then conspired with Martell to charge him with Disorderly Conduct. (DE#49, p.7, ¶¶36-38). Thomas claims that this 10/6/08 DR issued by Martell was retaliation for his having filed the lawsuit in this case. (DE#49, p.18, ¶5). Thomas in his complaint asserts that during his 10/6/08 interaction with Sgt. Martell, Martell allegedly said:

> ...we lock'd your ass up before about this, now you think because you filed a law suit, that scare somebody if all your food is on that tray, I'm taking your ass back to lockup.

(DE#49, p.7, ¶37).

Thomas alleges that this 10/6/08 DR was not investigated, and did not result in a Disciplinary Hearing.

### *The Plaintiff's Allegations Concerning*
### *The 10/10/08 DRs for "Spoken Threat" and "Disrespect;"*
### *Claims Against Martell, Pichardo, and Johnston*

Thomas alleges that on 10/10/08 Martell went to his cell to inform him that the food service hadn't sent his special food tray. Thomas alleges that when he asked Martell to call the Food Service to get him his special diet tray, Martell refused and told Thomas that if he refused the regular food tray that was sent, he was refusing to eat (allegedly stating: "you not getting shit, you refuse a regular tray, therefore you refuse to eat"). Thomas alleges that he asked Martell to summon Warden Pichardo, and that Pichardo had food service get him his special diet tray. (DE#46, p.7, ¶¶41, 42). Plaintiff Thomas alleges, however, that as a result of his interaction with Martell over the meal tray on 10/10/08, Martell lodged a DR against him for "Spoken Threat;" and that stemming from these events Pichardo also lodged a DR against him for "Disrespect to

Officials" (DE#46, pp.7-8, ¶43). Thomas alleges that the DRs by
Martell and by Pichardo were lodged in retaliation for his having
filed this lawsuit; and he claims that Martell and Pichardo con-
spired with regard to their issuance. He claims that Johnston also
conspired with Martell in regard to issuance of unfounded DRs as
retaliation for his having filed the lawsuit. (DE#49, p.18, ¶¶5-7).

### 3.   The Basis Demonstrated in the Record for
### Issuance of the 10/6 and 10/10/08 DRs, and the Results

The record, including Plaintiff Thomas' second amended com-
plaint (DE#49), the DR documentation (Ex.C at DE#78-3 [10/6/08 DR
for a 9-17 "Disorderly Conduct" violation]; Ex.F at DE#78-6
[10/10/08 DR for a 1-3 "Spoken Threats" violation]; and Ex. G at
DE#78-7 [10/10/08 DR for a 1-4 "Disrespect to Officials" viola-
tion]); and the defendants' Affidavits (Ex.B at DE#78-2 by Johnston;
Ex.aa at DE#78-27 by Martell; Ex.bb at DE#78-28 by Pichardo), reveal
the nature of the incidents that gave rise to the DRs in question,
and the bases on which the officers involved issued the DRs.

Thomas' allegations in the second amended complaint (discussed
_supra_ in Section "III.B.2." of this Report), the DR documentation,
and defendants' Affidavits, read together, show the following.

### _10/6/08: Rule 9-17 Violation (Disorderly Conduct)_

On 10/6/08 Thomas was unhappy with the food portions on his
supper tray and asked a food line worker to show him the menu.
Thomas alleges that Martell gave him the 9-17 DR for Disorderly
Conduct, that Johnson conspired in its issuance; and Thomas claims
that the DR was false and issued as retaliation for his filing this
lawsuit, and that it was never investigated and that no hearing on
it was held. Thomas, however, glosses over the details of the events
that occurred, and offers no details regarding his interaction with
the food worker or officers involved in the incident. The DR and
Martell's Affidavit fill in the missing details. They show that
Martell, who was supervising evening meals in Dining Hall #2 at

10

about 6:00 p.m., observed that Thomas' actions were stopping the
food line, in violation of DOC Rules, and that he was being verbally
abusive to the food staff. Martell instructed Thomas to stop his
actions, and Thomas replied "I'm going to start a riot, the food
suck." Thomas was given several more orders to stop his disorderly
conduct, but he did not do so, and Martell then issued the DR for
the 9-17 Disorderly Conduct violation. Captain Johnston, the Shift
Supervisor reviewed and approved the DR. Thomas was placed in
Administrative Confinement pending a disciplinary hearing.

    Martell and Johnston's Affidavits indicate that they had no
further involvement with the 10/06/08 Rule 9-17 DR, or related
proceedings (i.e., any investigation or disciplinary hearing that
normally would follow). Officer Viera conducted an investigation
between 10/6 and 10/8 (Ex.C); and as is normal procedure, Thomas was
placed in Administrative Confinement ("AC") pending a hearing (Exs.
C, D, and aa; and Ex.E, Plaintiff's Deposition at T/37), but none
was ever held (Ex.C; Ex.E, Depo at T/38-40).

    In regard to lack of completion of the disciplinary proceeding
on the 10/6 DR for the 9-17 [Disorderly Conduct] violation, the
record further shows the following.  Plaintiff Thomas at deposition
stated that "before the time period had elapsed for them to release
me on this specific charge, they charged me again with the other
charges for October the 10th." (Ex.C, Depo at T/39). Thus, Thomas
indicates that within days of the incident and issuance of the
10/6/08 DR, he was charged with new DRs on 10/10, and due to them
he remained on AC until his hearings and convictions on those new
charges. (Ex.E, Depo at T/39-40). With regard to the 10/6/08 charge,
the paperwork (Defendants' Ex.C) shows that ultimately, on 1/9/09,
the 10/6/08 DR for 9-17 Disorderly Conduct, which had had no
hearing, was "rejected" by officer Howell (Ex.C). Thomas states that
he never appealed the 9-17 DR matter, indicating he "had no reason
to," since as there was no hearing, and the confinement on AC for
the 10/6 violation overlapped with the charges and confinement
resulting from the events of 10/10/08. [To the extent that Thomas

in his Second Amended Complaint attempts to allege denial of due process in connection with his 10/6/08 DR and resulting confinement, the Due Process claim, which is distinct from the First Amendment retaliation claim, is discussed separately in Section IV of this Report, below].

### *The Two DRs Issued on 10/10/08 For:*
### *Rule 1-3 Violation (Spoken Threats), and*
### *Rule 1-4 Violation (Disrespect to Officials)*

On 10/10/08, Thomas received two DRs, one issued by Martell, [for "Spoken Threats"] and the other by Pichardo [for "Disrespect to Officials"]. They were based on discrete incidents which stemmed from an ongoing series of events.

As noted <u>supra</u>, without giving details about his own participation in the events in question, Thomas claims that on 10/10/08 Martell went to his cell to say that the food service mistakenly hadn't sent his special food. Thomas claims that he asked Martell to have the Food Service send it, and Martell refused, rudely stating that he would have to eat the regular food, or nothing at all. Thomas claims he then asked Martell to summon Warden Pichardo, and that when he arrived Pichardo had the food service send the special diet tray. (DE#46, p.7 at ¶¶41, 42). Thomas claims that stemming from his interaction with Martell over the missing food, Martell and Pichardo, respectively, gave him unwarranted DRs for "Spoken Threat" and "Disrespect" (DE#46, pp.7-8, ¶43). Specifically Thomas claims that the Martell and Pichardo issued the 10/10 DRs in retaliation because he had filed this lawsuit, and that they conspired to do so. Johnston also allegedly conspired with Martell to charge Thomas with unfounded DRs as retaliation for filing this lawsuit. (DE#49, p.18, ¶¶5-7).

### *Rule 1-3 (Threats)*

DR documents (Ex.F), and Martell's, Pichardo's and Johnston's Affidavits (Exs. aa, bb and B) provide missing details. They show that on 10/10/08 Martell as Dorm Supervisor was conducting feeding

in Quad one (the Confinement Unit where Thomas was on AC due to the 9-17 DR from 10/6). Thomas told Martell he was to have a pre-dialysis diet. Martell said he would call the food service, since the tray hadn't been sent to confinement. Thomas was very angry, and stated: "If you don't feed me, I will kill you on the compound fat poncho." Due to that threat Martell initiated the Rule 1-3 DR, and submitted the DR worksheet to the Shift Supervisor [Christopher Taggart] who reviewed it and approved issuance of the DR. Martell had nothing more to do with the DR, its investigation, or the DR hearing held on the charge. The matter was investigated by Sgt. Bethel from 10/11 to 10/13; Major Blontell Tate was a reviewing officer on 10/13; Susan Moles and Lt. C.Beck were DR hearing officers on 10/14; and inmate Thomas was found guilty and sentenced to 30 days of Disciplinary Confinement ("DC") with no loss of gain time. (Ex.F, DE#78-6).

### _Rule 1-4 (Disrespect)_

DR documents (Ex.G., DE#78-7), and Martell's and Pichardo's Af-fidavits (Exs. aa, bb) again provide missing details. They show that on 10/10/08 following the missing tray incident, after Thomas' threat toward Martell already had been made, Warden Pichardo approached the cell 107 where Thomas was housed. Pichardo saw that Thomas was still irate about his food not having been sent. Pichardo told Thomas that Martell had called the food service, and that he would receive the tray when it arrived. Pichardo chided Thomas, and said that he should not be disrespectful to the staff, and in response Thomas started yelling obscenities, and stated "Fuck the Sergeant." Thereupon, Pichardo told Thomas that he would be receiving a DR [for a Rule 1-4 violation, Disrespect]. After his issuance of that DR Pichardo had no involvement in its investigation, or the disciplinary hearing held on the charge.

The matter was investigated by Officer Saintlo from 10/10 to 10/14. [The plaintiff contended that Warden Pichardo was not present at his cell long enough for her to hear anything that was said. The hearing was postponed to allow a review of videotape. The videotape showed that the Warden went to Cell F-1 107, stopped briefly, and

then walked from the unit]. Major Blondell Tate was a reviewing officer on 10/15; Lt. Beck was a hearing officer on 10/16; and inmate Thomas was found guilty and sentenced to 30 days in DC and forfeiture of 60 days of gain time. (Ex.G, DE#78-7).

4.  **Analysis: The First Amendment Violation (Retaliation)**

For reasons discussed below, with respect to the First Amendment/retaliation claim [i.e., that the defendants conspired to give him retaliatory DRs on 10/6 and 10/10/08 because he filed this lawsuit] the defendants Martell, Pichardo, and Johnston are entitled to summary judgment in their favor. [To the extent that Thomas in his Second Amended Complaint attempts to allege denial of due process in connection with his 10/6/08 DR, the two 10/10/08 DRs, and resulting confinement, the Due Process claim, which is distinct from a First Amendment retaliation claim, is discussed separately in Section IV of this Report, below].

a.  **Conspiracy**

The record reveals that Thomas, in a conclusory manner, asserts that defendants conspired to write false DRs in violation of his constitutional rights. Vague, conclusory allegations of conspiracy, however, do not suffice to support a §1983 claim. Fullman v. Graddick, 739 F.2d 553, 556-557 (11 Cir.1984). Thomas must make fac-tual "allegations of combination, agreement, or understanding among all or between any of the defendants [or co-conspirators] [to] plot [ ], plan[ ], or conspire[ ] together to carry out the alleged chain of events." Ammlung v. City of Chester, 494 F.2d 811, 814 (3 Cir. 1974); see also Lawline v. American Bar Association, 738 F.Supp. 288, 295 at n.7 (N.D.Ill. 1990), aff'd, 956 F.2d 1378 (7 Cir. 1992); Carreon v. Baumann, 747 F.Supp. 1290, 1291-92 (N.D.Ill. 1990).

At his deposition, plaintiff Thomas was asked on what basis he concluded that the officers conspired to issue what he contends were

14

false DRs, and he responded that his basis for alleging conspiracy was that he did not commit the acts lodged in the DRs and nonetheless was charged by the officers. (DE#78-5, pp.70-71; Depo T/69-70).

The named defendants have established through their respective Affidavits [Ex.A, Johnston; Ex.aa, Martell; and Ex.bb, Pichardo], and the DR documents they generated [Exs. C, F, G], that issuance of the DRs was based on their observations and perception of Thomas' actions, and their beliefs that his acts constituted violations of Rules of Prohibited Acts warranting issuance of DRs. The fact that in instances where, under the Florida Administrative Code, a second more senior officer/shift supervisor was required to approve issuance of a fellow officer's DR, does not constitute conspiracy.[4]

Mere naked assertions or boilerplate allegations concerning a conspiracy are insufficient to state a viable constitutional claim. See Phillip v. Mashburn, 746 F.2d 782, 785 (11 Cir.1984); Theis v. Smith, 676 F.Supp. 874, 877 (N.D.Ill.1988). Thomas fails to show specific facts to support a claim that the defendants acted through a "combination, agreement, or understanding" or "plotted," "planned" or "conspired" to deprive him of his civil rights. Nor is there any support in Thomas' naked assertions of conspiracy to suggest that the defendants reached a meeting of the minds to violate his constitutional rights. Accordingly, his generalized allegations of a conspiracy are insufficient to support a claim for relief under

---

[4]     Johnston, as Shift supervisor, was required to review for approval the 10/6 DR issued by Martell for 9-17 Disorderly Conduct; he did so, and approved its issuance based on Martell's statements in the DR (Exs. A and aa).

Regarding the 10/10 DR issued by Martell for 1-3 Spoken Threats, Martell under DOC policy and procedure was required to submit the DR to his Shift Supervisor, Christopher Taggart, for review; Taggart reviewed and approved the DR as written, and it was issued (Ex.aa).

Regarding issuance of the 10/10 DR for Disrespect, Warden Pichardo, having been summoned to plaintiff Thomas' cell after Thomas' special diet tray had not been sent, and encountered a disturbance, Pichardo personally heard the obscenity uttered by Thomas toward the sergeant, told Thomas he would be receiving a DR, and issued the DR herself, without consultation, needing no approval from a supervisor since she [Pichardo] as Warden was a ranking officer (Ex.bb)].

42 U.S.C. §1983, <u>Fullman</u>, 739 F.2d at 556-557, and insofar as Thomas incorporates in his Retaliation claim an allegation that the defendants engaged in a conspiracy to issue the allegedly false DRs, his claim should be summarily dismissed as to all three defendants.

### b.  <u>Retaliation</u>

It is noted, before turning to other defenses raised by them, that defendants Martell, Johnston and Pichardo are correct in arguing that to the extent they may be deemed to have been sued in their official capacities, they are immune from damages based upon the Eleventh Amendment. <u>Gamble v. Fla. Dept. of Health and Rehabilitative Services</u>, 779 F.2d 1509, 1512-13 (11 Cir. 1986) (holding that absent a legitimate abrogation of immunity by Congress or waiver of immunity by the State, the Eleventh Amendment is an absolute bar to suit by an individual against the state, its agencies, or a responsible state officer sued in his official capacity).

The defendants, however, are also being sued in their individual capacities, and the Eleventh Amendment provides no bar to federal court adjudication of suits against state officers individually. <u>Gamble</u>, <u>supra</u> , 779 F.2d at 1512-13 (citing <u>Scheuer v. Rhodes</u>, 416 U.S. 232 (1974) and <u>Monroe v. Pape</u>, 365 U.S. 167 (1961)). Insofar as the defendants are sued for a First Amendment violation, which involves alleged violation of a constitutional right, but itself involves no physical injury, plaintiff Thomas if successful on the claim could be entitled to nominal damages, but not compensatory or punitive damages, in light of the PLRA physical injury requirement codified at 42 U.S.C. §1997e. That provision reads, as follows:

> (e) Limitation on recovery
>
> No federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

42 U.S.C. §1997e(e). <u>See</u> <u>Harris v. Garner</u>, 190 F.3d 1279, 1286-87 (11 Cir. 1999), *reh'g en banc granted and opinion vacated*, 197 F.3d 1297, 1286-87 (11 Cir. 1999), *opinion reinstated in pertinent part en banc,* <u>Harris v. Garner</u>, 216 F.3d 970, 984-85 (11 Cir. 2000) (PLRA Section 1997e(e) forecloses availability of compensatory and punitive damages, absent a showing of physical injury); <u>Hughes v. Lott</u>, 350 F.3d 1157, 1162 (11 Cir. 2003) (holding that §1997e(e) does not bar suits by prisoners who have not alleged a physical injury if they seek nominal damages); <u>Harris</u>, <u>supra</u>, 190 F.3d at 1287-88 (while §1997e(e) limits recovery of damages, it does not preclude a prisoner's right to seek declaratory and injunctive relief).

## I.   Re: Proof of Retaliaton

The plaintiff has alleged that the DRs were "false," as the DR initiated by Martell and approved by Johnston for issuance on 10/6/08 (for the 9-17 Disorderly Conduct violation), the DR initiated by Martell and approved by Taggart for issuance on 10/10/08 (for the 1-3 Threats violation), and the DR initiated/issued by Warden Pichardo on 10/10 (for the 1-4 Disrespect violation) all were retaliation because he had filed this lawsuit.


As to Martell, Johnston and Pichardo, on the claims concerning these DRs the plaintiff cannot demonstrate that the defendants were retaliating as alleged.  Thomas in a conclusory fashion alleges in the second amended complaint (DE#49, p.7, ¶37), and reiterates in his Declaration (¶15, DE#84 at p.5) that on 10/6 Martell, when confronting him about demanding to see the diet menu while he was in the chow line, allegedly said that "we locked your ass up before about this, now you think cause you filed a lawsuit, that scare somebody, if all your food is on that tray, I'm taking your ass back to lockup."  Despite this assertion, plaintiff Thomas has not demonstrated in this case that the defendants Martell (with Johnston's collusion) and Pichardo lodged the disciplinary reports against him because he had filed the complaint in this case. The three DRs in question were issued on October 6 and October 10, 2008.

The record (see the CM/ECF docket sheet in the case) demonstrates that the initial complaint (DE#1) was signed on August 18, 2008. This was approximately 7 weeks before the 10/16/08 DR was issued. Martell was not a named defendant in the initial complaint at that time (See DE#1). Moreover, in two respects the initial complaint (which had named Pichardo and Johnston, among others) was not a viable complaint. It was filed with the Clerk but the Court had taken no action to have it served upon any named defendant in 2008 (DE#s 1-9). Plaintiff Thomas was instructed by Court Order that the complaint was insufficient in various regards, and that he was being required to file a superseding Amended Complaint naming those directly responsible for any civil rights violations, and describing with as much precision as possible the actions of each individual. (Order, DE#7). He sought extensions of time in November 2008 (Motion DE#8) and late December 2008 (letter motion, DE#10), and the First Amended Complaint which named Martell for the First time in the case (DE#14) was not signed by Thomas and mailed to the court until January 20, 2009. The Second Amended Complaint (DE#49) in which Martell (with Pichardo and Johnston) again was named was signed and mailed on July 19, 2009. No action was undertaken by the Court to obtain service of process upon any defendant in the case until entry of a Service Order on February 18, 2009 (Order DE#15), which was entered in conjunction with the Preliminary Report (DE#16). Service did no go forward in February. (Summonses for use along with the Service Order were not issued by the Clerk until March 3, 2009 (DE#s 18-20)). It was not until March 27, 2009, that executed Process Receipts and Return (DE#s 23-25) were filed for the three defendants [they show that Pichardo, Johnston, and Martell, respectively were personally served by the Deputy U.S. Marshal with a summons and copy of the first amended complaint at 11:05, 11:18, and 11:30 a.m. on March 20, 2009, more than 5 months after the October 2008 DRs were lodged against plaintiff Thomas, allegedly as retaliation].

In pro se prisoner civil rights actions such as this, in which the plaintiff is proceeding in forma pauperis, it is the responsibility of the Court to Order service through the U.S. Marshals Service, and initial complaints are not served until entry of a

18

Preliminary Report upon initial screening of the pleading to determine its sufficiency.  Therefore there ordinarily is no notice of the lawsuit to a named defendant until the summons and complaint have been served by the Marshal upon the defendant.

Examination of the First Amended Complaint (DE#14) which the Court did order to be served in February 2009, reveals that it included a "Declaration, Certificate of Service" by plaintiff Thomas stating that "a true copy of the foregoing Amended Complaint has been placed in the hands of prison officials for mailing to all named defendants at Everglades Correctional Institution" on January 20, 2009. This was three months after issuance of the October 2008 DRs and therefore [if it were assumed that the complaints were mailed by "prison officials" as stated, this could not have constituted notice to the defendants prior to issuance of the DRs in question that they were being sued by Thomas; and the January 2009 mailing therefore logically could not be a basis for showing that the defendants issued the DRs as retaliation.

Careful examination of the Original Complaint in this case (see DE#1, at p.8) also reveals that [although his doing so would not constitute service of process], the plaintiff included a Certificate of Service indicating that through the institutional mail system he had sent copies of the initial complaint to Pichardo, Johnston, Rosado and Jurado on August 18, 2008, some 7 weeks before the allegedly retaliatory DRs were issued.

Martell, to whom plaintiff Thomas attributes a comment on October 6, 2008, allegedly stating "you think cause you filed a lawsuit, that scare somebody," was not among the named defendants in the case at that time; and he (Martell) according to Thomas' 8/18/08 "Certificate of Service" was not among those whom Thomas intended to receive the initial complaint via internal prison mail.

In their Affidavits, defendants Johnston (at Ex. B, ¶14) and Martell (at Ex. aa, ¶21) state that their <u>first</u> knowledge of the existence of plaintiff Thomas' civil lawsuit against them was on March 20, 2009 when they were served with a summons and copy of the amended complaint.  The plaintiff has submitted no evidence showing that this is untrue; and since unrefuted evidence indicates that neither Johnston or Martell was aware before March 20, 2009 that a complaint or amended complaint had been drafted and that they were being sued, then Pichardo [whose affidavit does not include a statement about his first knowledge of the lawsuit] cannot have told them that Thomas had drafted and mailed to the Court a complaint.

In light of their showing that they did and could not have acted in retaliation because they did not know of the lawsuit until March 20, 2009 [a showing which Thomas has not rebutted with evidence of the sort contemplated under <u>Fed.R.Civ.P.</u> 56], it cannot be said that Thomas has created an issue of material fact. As to Johnston and Martell, Thomas' retaliation claim therefore fails.

Even if the Court were to conclude that the defendants knew about Thomas' lawsuit against them prior to the issuance of the 10/6 and 10/10/08 DRs, there are additional grounds upon which the Thomas' retaliation claim against Martell, Johnston, and Pichardo is subject to summary disposition.

Courts have long recognized that conclusory allegations of retaliation claim will not stand, especially where defendants have made showings that there existed proper non-retaliatory reasons for issuance of DRs, even if an inmate plaintiff had earlier filed a suit or grievances and then claimed that the issuance of the DRs was retaliation. A prisoner's allegations must amount to more than "general attacks" on a defendant's motivations; and he must produce "affirmative" evidence" of retaliation from which a jury could find that he had carried the burden of proving the requisite motive. <u>Crawford-El v. Britton</u>, 523 U.S. 574, 600 (1998). A prisoner does not automatically cast doubt on a prison decision, nor is such a

20

decision "subject to exhaustive challenge" just because the prisoner
has exercised a First Amendment right. <u>Adams v. James</u>, 784 F.2d
1077, 1082 (11 Cir. 1986); <u>Adams v. James</u>, <u>supra</u>, 797 F.Supp. at
949. Prison officials lack authority to prohibit inmates' First
Amendment right to file grievances [or lawsuits], but it does not
follow that every time an inmate does so, his/her act of doing so
renders the exercise of prison authority suspect. <u>Cranford. V.
Hammock</u>, No. 1:09-cv-00070-MP-AK, 2010 WL 916031, at *8 (N.D.Fla.,
March 11, 2010)(citing <u>Adams</u>, <u>supra</u>, 784 F.2d at 1082).


     While a prisoner alleging retaliation need not show "clear and
convincing" evidence of unconstitutional motive by a defendant,
<u>Cranford</u>, at *8, citing <u>Crawford-El</u>, <u>supra</u>, 523 U.S. 580-86), it has
also been recognized that courts should approach prisoner claims of
retaliation "with skepticism" and particular care due to the near
inevitability that prisoners will take exception with the decisions
of prison officials and because claims of retaliation are "easily
fabricated." <u>Cranford</u>, <u>supra</u>, at *8 (quoting <u>Dawes v. Walker</u>, 239
F.3d 489, 491 (2 Cir. 2001)(*implied|y overturned in part on other
grounds by* <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506 (2002)).


     In this case, through their affidavits and the DR documentation
[discussed <u>supra</u>, at length], the defendants have shown that based
on their observations of and perceptions regarding the plaintiff's
behavior, there was reason to believe he had violated prison
regulations (i.e. committed prohibited acts), and that there were
therefore proper, non-retaliatory bases for lodging the DRs on 10/6
and 10/10. The fact that the 10/6/08 "Disorderly Conduct" DR by
Martell slipped though the cracks after its issuance, and received
no hearing, and ultimately was "rejected" due to the administrative
error, does not mean that the events as perceived by Martell during
the underlying incident in question did not form a proper basis for
giving Thomas the DR for an infraction of institutional rules. Both
of the 10/10/08 DRs (the first by Martell for Threats, and the
second by  Pichardo for disrespect) resulted in convictions and

disciplinary sentences, and it is implicit that the DR hearing officers found there existed a proper basis for issuance of the DRs.

To the extent that plaintiff Thomas contends that he did not commit the acts charged, and the defendants proffer evidence that he did, it is not this Court's role to readjudicate the results of a prison disciplinary proceeding. Superintendent Mass. Corr. Inst. v. Hill, 472 U.S. 445, 455 (1985) (In determining whether there is "some evidence" in the record to support the decision in a prison disciplinary proceeding, the federal courts do not engage in a de novo review of the evidence); Graham v. Searcy, No. 5:10-cv-00065-RS-AK, 1020 WL 1731054, at *1, (N.D.Fla., April 28, 2010) (federal courts do not review disciplinary proceedings to determine if the results were correct); Chandler v. Rivera, No. 1:07CV145-MP/AK, 2008 WL 170327, at *1 (N.D.Fla., Jan.15, 2008) (Federal courts do not sit as review courts for disciplinary proceedings).

## ii. Heck v. Humphrey

In addition, even if it were not subject to dismissal for reasons discussed above, the portion of the second amended complaint raising the retaliation claim against Pichardo in connection with the 10/10 DR for Disrespect, is barred under Edwards v. Balisok, 520 U.S. 641 (1997), and Heck v. Humphrey, supra, the application of which the defendants have asserted as a defense. This is because Thomas lost gain time as a result of his conviction at the disciplinary proceeding, thereby lengthening his sentence; and that conviction at his disciplinary hearing has not been overturned.[5]

## iii.  Lack of Administrative Exhaustion

---

[5]    In Heck, the Supreme Court held that if a judgment in favor of a state prisoner seeking damages in a §1983 suit would necessarily imply the invalidity of a conviction or sentence, the claim for damages is not cognizable under §1983 and the complaint must be dismissed, because the claim will not exist unless and until the prisoner can demonstrate that the conviction or sentence has previously been reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus. Although the Heck decision did not concern a disciplinary proceeding, its holding was subsequently extended to inmates' attacks on prison disciplinary proceedings, where the inmate's claim for damages is based upon an institutional administrative ruling which resulted in the loss of credits against the inmate's sentence, thereby having the effect of lengthening the sentence. Edwards v. Balisok, supra.

The defendants also argue that plaintiff Thomas did not exhaust his available administrative remedies as required under 42 U.S.C. §1997e(a) with regard to the claim of retaliation.

On April 26, 1996, the Prison Litigation Reform Act of 1995 ["PLRA"] was enacted, significantly altering a prisoner's right to bring civil actions *in forma pauperis*, and in pertinent part placed new restrictions on a prisoner's ability to seek federal redress concerning the conditions of his confinement. Upon its enactment the PLRA included a pre-suit administrative exhaustion requirement, which is codified as part of 42 U.S.C. § 1997e. Courts have made clear that with enactment of the PLRA, Section §1997e(a), as amended, now requires prisoners to have fully exhausted those administrative processes which are available before bringing suit in federal court.[6]  The Florida DOC, being statutorily required to implement "rules relating to... grievance procedures [conforming with] §1997e," Fla. Stat. §944.331, established a three-step inmate grievance procedure for use by all inmates in their custody, as set forth in Chapter 33-103 of the Florida Administrative Code.[7]

---

[6]      See Chandler v. Crosby, 379 F.3d 1278, 1286 (11 Cir. 2004)(under the PLRA, a district court must dismiss the suit when it finds that the inmate/plaintiff has not exhausted his administrative remedies); Miller v. Tanner, 196 F.3d 1190, 1193 (11 Cir.1999)(incarcerated state prisoner must first comply with grievance procedures established by the state department of corrections before filing a federal suit under §1983); Harper v. Jenkin, 179 F.3d 1311, 1312 (11 Cir. 1999) (where an inmate/appellant's grievance was untimely, he must have sought leave to file an out-of-time grievance, and if he has not done so before bringing suit, then his administrative remedies will be considered unexhausted, since to find otherwise would allow inmates to simply ignore the PLRA's exhaustion requirement and still gain access to federal court); Alexander v. Hawk, 159 F.3d 1321, 1325 (11 Cir. 1998) ("Congress now has mandated exhaustion in section 1997e(a) and there is no longer discretion to waive the exhaustion requirement"). See also: Booth v. Churner, 532 U.S. 731, 736–41 (2001) (holding that under §1997e(a) of the PLRA, "one 'exhausts' processes, not forms of relief, and the statute provides that one must;" and further holding that "we think that Congress had mandated exhaustion clearly enough, regardless of the relief offered through administrative procedures").

[7]      The administrative "processes" which an inmate in the Florida DOC is expected to exhaust are set out in the Florida Administrative Code Rules ("F.A.C.") pertaining to inmate grievances.  Those rules are currently set out in F.A.C. §33-103 et seq. They provide for the filing of an Informal Grievance utilizing a Form DC6-236, see F.A.C. §33-103.005(1) et seq., and thereafter, if dissatisfied with the response, the inmate may file a formal grievance to the Warden, utilizing Form DC1-303, see: F.A.C. §33-103.006, et seq.  Then, in the event that the inmate feels that the grievance has not been satisfactorily resolved during the formal grievance procedure, an appeal may be submitted using the "Request for Administrative Remedy or Appeal, Form DC1-303," to the Office of the Secretary, see F.A.C. §33-103.007, et seq.

The Eleventh Circuit and Supreme Court have outlined policy concerns underlying the exhaustion requirement, which are served when inmates are not permitted to simply ignore the PLRA's exhaustion requirement, and yet gain access to federal court.[8]

As discussed supra, a prisoner is to fully exhaust his available administrative remedies before bringing suit on a claim in federal court. As discussed more fully, below, in footnote 10 and related text of this Report, a prisoner is to do so by exhaustively complaining via the available prisoner grievance procedure about the same thing later alleged in his complaint in federal court.

Review of the record in this case (including unscanned exhibits attached to DE#49) indicates that Thomas did file grievances after October 2008 concerning other matters relating to his DRs and his disciplinary hearings, but those DRs complained about matters relating essentially to alleged denial of Due Process, and did not grieve that the 10/6 and 10/10/08 DRs had been issued as Retaliation

---

[8]     The Eleventh Circuit has described seven policy reasons for favoring an exhaustion requirement: (1) to avoid premature interruption of the administrative process; (2) to let the agency develop the necessary factual background upon which decisions should be based; (3) to permit the agency to exercise its discretion or apply its expertise; (4) to improve the efficiency of the administrative process; (5) to conserve scarce judicial resources, since the complaining party may be successful in vindicating rights in the administrative process and the courts may never have to intervene; (6) to give the agency a chance to discover and correct its own errors; and (7) to avoid the possibility that frequent and deliberate flouting of the administrative processes could weaken the effectiveness of an agency by encouraging people to ignore its procedures. Alexander v. Hawk, supra, 159 F.3d at 1327; Johnson v. Meadows, 418 F.3d 1152, 1156 (11 Cir. 2005).  The Supreme Court, in 2002, observed that the current exhaustion requirement under §1997e(a) was designed to reduce the quantity and improve the quality of prisoner suits, and affords corrections officials an opportunity to address complaints internally before allowing the initiation of a federal case; and in some instances, corrective action taken in response to a grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation. Porter v. Nussle, 534 U.S. 516, 516-17 (2002). The Court further noted that in other instances, the internal review might filter out some frivolous claims; and for cases ultimately brought to court, an administrative record clarifying the controversy's contours could facilitate adjudication. Id. at 517.

because Thomas had earlier brought a lawsuit against officers
involved in issuing/approving the DRs.[9]


Although the record shows that plaintiff Thomas grieved about
other matters relating to his DRs and disciplinary hearings, those
claims are markedly different legal claims than a First Amendment
claim of retaliation. Absent grievances sufficient to put the named
defendants and prison administration on notice that Thomas was
claiming that the DRs were issued as Retaliation for his filing of
this lawsuit [in violation of his rights under First Amendment],
thereby allowing that claim to be internally administratively
addressed [before suit in federal court was brought], see Alexander
v. Hawk, supra, 159 F.3d at 1327 and Johnson v. Meadows supra, 418
F.3d at 1156, it is apparent that the First Amendment retaliation
claim presently at bar was not properly administratively exhausted
via the DOC inmate grievance procedure before Thomas sued on the
claim under §1983 in federal court.[10]   Accordingly, the portion of

---

[9]      Those of Plaintiff's Exhibits which were electronically scanned and
are available for viewing on CM/ECF appear at DE#46, pp. 21-90. These include a
few grievance documents dated prior to October 2008.

Additional unscanned Exhibits, filed by Thomas include copies of grievances
filed by him in 2009, and in 2008 after October 6. These documents were submitted
on folded, irregular sized paper, and therefore were not scanned by the clerk for
viewing on CM/ECF. They are attached to the original copy of his Second Amended
Complaint [file stamped July 31, 2009] which is located in an official court
record maintained by the Clerk for this case at the Records Department, in an
expansion folder labeled: "1:08CV22333-X1."

In the unscanned grievances (at DE#49), Thomas complained inter alia that:
he did commit the alleged act; failure to provide a hearing and findings on a DR
violated Due Process; failure to view and consider videotape should render a DR
null and void; a DR that allegedly did not clearly list the specific rule
violated was non-compliant with procedure; plaintiff believed that a DR hearing
team's enumeration of facts was not written contemporaneously with their
conclusions; and in one instance he was mentally impaired by high blood pressure
and his kidney condition and should not be held responsible for the violation.

[10]      The requirement that an inmate provide in his administrative
grievances "all relevant information reasonably available to him," see Brown v.
Sikes, 212 F.3d 1205, 1207-08 (11th Cir.2000) logically requires that the essence
of each claim later brought in a civil suit for damages must have clearly been
outlined and complained of in the prisoner's underlying administrative
grievances, if the policies underlying the enforcement of exhaustion
requirements, see Porter v. Nussle, 534 U.S. 516, 516-17 (2002) and Alexander v.
Hawk, supra, are to be given meaningful effect.  As discussed by the District
Court for the Northern District of Florida, in Goldsmith v. White, 357 F.Supp.2d

Thomas' second amended complaint alleging that his 10/6 and 10/10 DRs were in retaliation for his bringing this lawsuit, is also subject to dismissal pursuant to 42 U.S.C. §1997e(a), for lack of pre-suit administrative exhaustion.

### 5.  Conclusion Re Disposition of Defendants' Motion DE#78) and Plaintiff's First Amendment Retaliation Claim Against the Defendants Pichardo, Johnston, and Martell

Based on the reasons stated in the foregoing analysis, it is recommended that, as to the claim that the defendants Pichardo, Johnston, and Martell engaged in conspiracy to lodge DRs against plaintiff Thomas in October 2008, as retaliation because he filed this lawsuit against them, the defendants' motion for summary judgment DE#78 be GRANTED, and that on those claims against them, the complaint, as amended, be dismissed.

### IV.  REMAINING CLAIMS IN THE SECOND AMENDED COMPLAINT AGAINST PICHARDO, JOHNSTON AND MARTELL, AND 8 OTHER DEFENDANTS

---

1336, 1338-40 (N.D.Fla. 2005), a prisoner's failure to include specific know facts, and identify the specific problem being complained of, so that prison officials are alerted to the problem, and have an opportunity to address it, may result in the plaintiff being barred, under the PLRA exhaustion requirement, from bringing a later civil suit based on the same set of facts. Goldsmith, supra, 357 F.Supp.2d at 1340-41 (holding that inmate Goldsmith's failure to mention his sexual orientation, and failure to identify the core facts on which his claim was based, i.e., that he is homosexual, and that the defendant Officer Smith used a bigoted reference to homosexuality when he took the action at issue -- depriving the plaintiff of contact lenses which he had been allowed to possess in the Florida DOC for approximately 5 years -- meant that his administrative remedies were unexhausted, and his complaint was subject to dismissal). See Johnson v. Johnson, 385 F.3d 503, 518 (5 Cir. 2004) (prisoner who complained that officials failed to protect him from assaults by other inmates, brought suit on three separate theories [imposition of cruel and unusual punishment; denial of equal protection, based on sexual orientation; denial of equal protection, based on race], and presented enough facts in grievances regarding the assaults and his homosexuality that the Court deemed his Eighth Amendment and Sexual Orientation claims to be exhausted, but he had not alleged facts in his grievances giving officials notice of an possible race problem, and therefore his Race-based Equal Protection claim was unexhausted, and subject to dismissal. See also Wilson v. Taylor, No.4:01CV158-RV, 2002 WL 950062 at *2 through *4 (N.D.Fla. Feb.28, 2002)(holding, where a Native American inmate/plaintiff who in the body of his complaint and prayer for relief raised no less than 15 claims asserting violations of his right to free exercise of his religious beliefs, 4 claims relating to religious practices were deemed to have been exhausted, but others also relating to religious practices which were not raised in his grievances were subject to dismissal)(citing Brown v. Sikes, supra, 212 F.3d at 1207-08).

After the prior Report (DE#16) screening the First Amended Complaint (DE#14) was denied, as moot (Order DE#52), the case remained pending on the Second Amended Complaint (DE#49).

Apart from the First Amendment retaliation claim against defendants Martell, Johnston, and Pichardo, analyzed above in this report upon their motion for summary judgment, the Second Amended Complaint remains pending on additional claims against Pichardo, Johnston, and Martell not addressed in their summary judgment motion; as well as on claims against 8 other defendants (Rosado, Balmir, Jurado, Moles, Beck, Lafond, Perkins, Tate), and unnamed persons designated as Defendants John Doe. The Second Amended Complaint at DE#49 is now before the Court for initial screening of those claims pursuant to 28 U.S.C. §1915, because Thomas is proceeding in forma pauperis [DE#6].

## A. **Analysis**

For preliminary review of the unscreened claims, the same standard set out in the prior Report (DE#16) applies.[11]

---

[11]    As amended, 28 U.S.C. §1915 reads in pertinent part as follows:

Sec. 1915 Proceedings in Forma Pauperis

                    *   *   *

        (e)(2) Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that –
                    *   *   *

        (B) the action or appeal –

                    *   *   *

        (i)  is frivolous or malicious;

        (ii) fails to state a claim on which relief may be granted; or

        (iii) seeks monetary relief from a defendant who is immune from such relief.

27

Plaintiff Thomas plaintiff raises allegations against 12 defendants:

1.   Warden Gisela Pichardo

2.   Captain Jeffrey Johnston

3.   Sergeant Eriberto Rosado

4.   Sergeant Juan Martell

5.   Dr. Carl Balmir (the Chief Health Officer at ECI)

6.   Dora Jurado (the Food Service Director at ECI)

7.   Susan Moles

8.   Clifford Beck

9.   Alix Lafond

---

A complaint is "frivolous under section 1915(e)" where it lacks an arguable basis either in law or in fact." <u>Neitzke v. Williams</u>, 490 U.S. 319, 325 (1989); <u>Bilal v. Driver</u>, 251 F.3d 1346, 1349 (11 Cir.), <u>cert. denied</u>, 534 U.S. 1044 (2001). Dismissals on this ground should only be ordered when the legal theories are "indisputably meritless," <u>id.</u>, 490 U.S. at 327, or when the claims rely on factual allegations that are "clearly baseless." <u>Denton v. Hernandez</u>, 504 U.S. 25, 31 (1992). Dismissals for failure to state a claim are governed by the same standard as Federal Rule of Civil Procedure 12(b)(6). <u>Mitchell v. Farcass</u>, 112 F.3d 1483, 1490 (11 Cir. 1997)("The language of section 1915(e)(2)(B)(ii) tracks the language of Federal Rule of Civil Procedure 12(b)(6)"). In order to state a claim, a plaintiff must show that conduct under color of state law, complained of in the civil rights suit, violated the plaintiff's rights, privileges, or immunities under the Constitution or laws of the United States. <u>Arrington v. Cobb County</u>, 139 F.3d 865, 872 (11 Cir. 1998).

<u>Pro se</u> complaints are held to "less stringent standards than formal pleadings drafted by lawyers and can only be dismissed for failure to state a claim if it appears 'beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1979) (quoting <u>Haines v. Kerner</u>, 404 U.S. 519, 520-21 (1972)). The allegations of the complaint are taken as true and are construed in the light most favorable to Plaintiff. <u>Davis v. Monroe County Bd. Of Educ.</u>, 120 F.3d 1390, 1393 (11 Cir. 1997). The complaint may be dismissed if the plaintiff does not plead facts that do not state a claim to relief that is plausible on its face. <u>See</u> <u>Bell Atlantic Corp. v. Twombly</u>, 127 S.Ct. 1955 (2007)(retiring the oft-criticized "no set of facts" language previously used to describe the motion to dismiss standard and determining that because plaintiffs had "not nudged their claims across the line from conceivable to plausible, their complaint must be dismissed" for failure to state a claim); <u>Watts v. FIU</u>, 495 F.3d 1289 (11 Cir. 2007). While a complaint attacked for failure to state a claim upon which relief can be granted does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 127 S.Ct. at 1964-65. The rules of pleading do "not require heightened fact pleading of specifics . . . ." The Court's inquiry at this stage focuses on whether the challenged pleadings "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." <u>Erickson v. Pardus</u>, 127 S.Ct. 2197, 2200 (2007)(quoting <u>Twombly</u>, 127 S.Ct. at 1964).

10.   Alonzo Perkinds

11.   Blondell Tate

12.   Defendants John Doe

## 1. Alleged Medical Indifference (Eighth Amendment)

Thomas sues Dr. Balmir for medical indifference, based on discontinuation of two medications, which according to Thomas were not re-prescribed until about two months later.

Thomas alleges that he had a kidney condition, preexisting from 2002, for which doctors prescribed Enalapril, Phoslo, Nepro, and a pre-dialysis diet order.   He arrived at ECI on June 13, 2008. At initial intake Dr. Balmir noted that Thomas had been receiving those things, in addition to Natural Fiber. Upon his evaluation, Dr. Balmir ordered continuation of the Enalapril, fiber, and pre-dialysis diet, and discontinued the Phoslo and Nepro. Thomas states that later, after July 25, 2008 blood test results showed "results outside the expected limits," the Phoslo was re-prescribed on August 8, 2008. The plaintiff alleges that he was seen by Dr. Balmir on August 14, 2008, and requested a transfer to RMC to be prepared for dialysis, and alleges that after a second round of blood test results were received on August 25, 2008, which also were "outside the expected limits," the Nepro was re-prescribed the same day. Plaintiff alleges that on October 24, 2008 he was transferred to RMC. The exact date on which he was returned to ECI is not clear from the complaint.

Deliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eight Amendment.  Estelle v. Gamble, 429 U.S. 97, 104 (1976). Whether an inmate's medical need requires attention as a matter of constitutional right depends upon its severity. See Estelle, supra, at 104-06. Generally, a serious medical need is considered "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Farrow v. West, 320 F.3d 1235,

29

1243 (11 Cir. 2003) (quoting <u>Hill v. Dekalb Reg'l Youth Det. Ctr.</u>, 40 F.3d 1176, 1187 (11 Cir. 1994)).

Section 1983, requires an affirmative causal connection between an official's acts and an alleged constitutional deprivation. <u>Harris v. Ostrout</u>, 65 F.3d 912, 917 (11 Cir. 1995); <u>Swint v. City of Wadley, Ala.</u>, 51 F.3d 988, 999 (11 Cir. 1995). Negligence is not enough,[12] and a mere difference of opinion between an inmate and prison medical staff concerning his diagnosis and course of treatment, including prescription of or discontinuation of medication, does not rise to the level of a constitutional deprivation.[13] Thus, it is well settled that a showing of mere negligence, neglect, or medical malpractice is insufficient to recover on a §1983 claim. <u>Estelle</u>, <u>supra</u>; <u>Adams v. Poag</u>, 61 F.3d 1538 (11 Cir. 1995). In fact, once an inmate has received medical care, courts are hesitant to find that a constitutional violation has occurred. <u>Hamm v. DeKalb County</u>, 774 F.2d 1567, (11 Cir.), <u>cert. denied</u>, 475 U.S. 1096 (1986). To prevail on such a claim, the detainee must establish: 1) an "objectively serious deprivation," i.e. a serious medical need accompanied by a substantial risk of serious harm if unattended; 2) a response by public officials beyond negligence, i.e., one that is

---

[12]    It is well settled that a showing of mere negligence, neglect, or even medical malpractice is insufficient to recover on a §1983 claim. A showing of conscious or callous indifference is required. <u>Estelle</u>, <u>supra</u>, 429 U.S. at 104-06; <u>Daniels v. Williams</u>, 474 U.S. 327 (1986); <u>Farrow</u>, <u>supra</u>, 320 F.3d at 1243; <u>Brown v. Hughes</u>, 894 F.2d 1533, 1537-38 (11 Cir. 1990); <u>Washington v. Dugger</u>, 860 F.2d 1018, 1021 (11 Cir. 1988).

[13]    The Courts have long recognized that a difference of opinion between an inmate and prison medical staff regarding medical matters, including the diagnosis or treatment which the inmate receives, cannot in itself rise to the level of a cause of action for cruel and unusual punishment, and have consistently held that the propriety of a certain course of medical treatment is not a proper subject for review in a civil rights action. <u>Estelle</u>, <u>supra</u>, at 107 ("matter[s] of medical judgment" do not give rise to a §1983 claim). <u>See</u>: <u>Ledoux v. Davies</u>, 961 F.2d 1536 (10 Cir. 1992) (inmate's claim he was denied medication was contradicted by his own statement, and inmate's belief that he needed additional medication other than that prescribed by treating physician was insufficient to establish constitutional violation); <u>Ramos v. Lamm</u>, 639 F.2d 559, 575 (10 Cir. 1980) (difference of opinion between inmate and prison medical staff regarding treatment or diagnosis does not itself state a constitutional violation), <u>cert. denied</u>, 450 U.S. 1041 (1981); <u>Smart v. Villar</u>, 547 F.2d 112, 114 (10 Cir. 1976) (same); <u>Burns v. Head Jailor of LaSalle County Jail</u>, 576 F.Supp. 618, 620 (N.D. Ill., E.D. 1984) (exercise of prison doctor's professional judgment to discontinue prescription for certain drugs not actionable under §1983).

so inadequate as to constitute and "unnecessary and wanton inflic-
tion of pain;" and 3) an attitude of deliberate indifference, which
shows that the defendants were aware of the facts from which a sub-
stantial risk of serious harm could be inferred, and that they
actually did draw that inference. Taylor v. Adams, 221 F.3d 1254,
1258 (11 Cir. 2002). Cf Brown v. Johnson, 387 F.3d 1344, 1351 (11th
Cir. 2004)(to establish that a prison official acted with deliberate
indifference to a serious medical need, "the prisoner must prove
three facts: (1) subjective knowledge of a risk of serious harm; (2)
disregard of that risk; and (3) by conduct that is more than mere
negligence").


       As the Eleventh Circuit has noted, even proof that the defen-
dant should have perceived a risk, but did not, is insufficient.
Campbell v. Sikes, 169 F.3d 1353, 1364 (11 Cir. 1999)(citing Farmer
v. Brennan, 511 U.S. 825, 838 (1994); Cottrell v. Caldwell, 85 F.3d
1480, 1491 (11 Cir. 1996)(the official must have a subjectively
"'sufficiently culpable state of mind,'" and "[t]here is no liabili-
ty for 'an official's failure to alleviate a significant risk that
he should have perceived but did not...'") (quoting Farmer, supra,
511 U.S. at 834, 838). Liability may be imposed for deliberate in-
difference only if the plaintiff proves the defendant actually knew
of "an excessive risk to inmate health or safety" and disregarded
that risk." Campbell, supra, at 1364 (citing Farmer, at 837).


       For purposes of this Report, plaintiff Thomas' kidney
condition, diagnosed by physicians, for which diet and medication
had been prescribed as treatment, clearly qualifies as a serious
medical need/condition.  Farrow, supra.


       At paragraphs 55-59 of his pleading, plaintiff Thomas claims
that Dr. Balmir is to blame for a worsening of his medical condition
while he was not receiving the Phoslo and Nepro. Thomas states that
Phoslo helps control excess buildup of phosphate by inhibiting its
absorption in the intestine. He states that the Phoslo is needed be-
cause the rate of removal of phosphate by manipulating the patient's

31

diet or by dialysis is insufficient. He further states that Nepro is given to supplement vitamins, because kidney diets are nutritionally inadequate to satisfy a patient's vitamin requirements.

Thomas alleges that Dr. Balmir was aware of his renal condition when he arrived at ECI on June 13, 2008, and nonetheless discontinued the Phoslo and Nepro. Merely uttering the words "deliberate indifference" and asserting that Dr. Balmir's action constituted "deliberate infliction" of serious harm, is not enough. Thomas alleges that days after the two medications were discontinued, he began to experience symptoms, including weight loss, muscle cramps, stomach pain, burning feet, headaches, and insomnia, according to him, in part due to diet, and in part due to lack of proper medication (DE#49, p.4, ¶13). Thomas alleges in his pleading (DE#49, p.5, ¶25) that he "grieved to the Regional Director of Institutions on about 6/30/08 about his diet and medication and received a 7/23/08 Response. Apparently Thomas' 6/30 letter was prompted by the 6/21/08 Juice incident, as the Regional Director Villacorta's 7/23/08 response to his 6/30 communication stated that Thomas had been convicted on 6/21/08 for a 6-1 violation, and that he had the right to appeal the conviction. Villacorta also stated: "You were examined by the doctor on May 23, 2008 [a date before his arrival at ECI], and was authorized a special diet. You are receiving that diet. You are receiving on a daily basis the proper medications as prescribed by the doctors." (DE# 49, p.87).

Thomas does not allege in his pleading that he spoke directly to Dr. Balmir to complain of his symptoms, nor does he allege in his pleading or demonstrate via grievances attached thereto that he complained in any grievance(s) received or handled by Balmir about symptoms he claims he suffered after discontinuation of the Phoslo and Nepro. He claims only that he saw Dr. Balmir twice, on June 13 when the medications were stopped, and again on August 14, 2008. Thomas' pleading states he was provided examination and laboratory testing in late July 2008 and August 2008, thus indicating that he was monitored and that his condition/symptoms were not ignored. The

32

testing resulted in reevaluation of Dr. Balmir's June 13, 2008 decision to discontinue the two medications, and according to Thomas, in response to the testing, they were re-prescribed.

The allegations of the complaint reflect a difference of opinion between inmate plaintiff and prison medical staff, which, without more, does not rise to the level of a constitutional tort. Estelle v. Gamble, supra. If they were negligence, Dr. Balmir's decisions would not suffice to establish the existence of a constitutional tort. Id. Even if, assuming arguendo, Dr. Balmir's decisions could be deemed to rise to the level of medical malpractice, that would not suffice to impose liability in a §1983 suit for damages. Estelle, supra, 429 U.S. at 105-06; Adams v. Poag, supra, 61 F.3d at 1543-44; Taylor v. Adams, supra, 221 F.3d at 1258. On its face, based on the allegations therein, the second amended complaint does not indicate that Dr. Balmir was aware of facts from which the inference could be drawn that his decisions regarding Thomas' medications placed his patient at a substantial risk of serious harm, and that Balmir drew the inference yet failed to act differently. Farmer v. Brennan, supra, 511 U.S. at 834, 837-38; Campbell v. Sikes, supra, at 1364; Cottrell v. Caldwell, supra, 85 F.3d at 1491. Failure to perceive the risk is not enough, and in this case Thomas' allegations indicate that after he exhibited symptoms, testing was conducted, and medications were re-prescribed.

Accordingly, the medical indifference claim against Dr. Balmir should be dismissed, pursuant to 28 U.S.C. §1915(e)(2)(B)(ii).


## 2.   Supervisory Liability/Failure to Train (Diet)

In connection with his dietary concerns, Thomas asserts that Warden Pichardo failed to properly train prison staff with regard to care of inmates with kidney conditions. To the extent the plaintiff seeks to impose supervisory liability based on failure to train against Pichardo, his claim fails.  Public officials in supervisory positions cannot simply be held vicariously liable for the acts of their subordinates.  Robertson v. Sichel, 127 U.S. 507 (1888); Byrd v. Clark, 783 F.2d 1002, 1008 (11 Cir. 1986).  Nor can

liability be predicated solely upon the doctrine of <u>respondeat</u> <u>superior</u> in a §1983 action. <u>Monell v. Department of Social</u> <u>Services</u>, 436 U.S. 658 (1978); <u>Vineyard v. County of Murray,</u> <u>Georgia</u>, 990 F.2d 1207 (11 Cir. 1993). Further, under appropriate circumstances the failure to adequately train or supervise may give rise to a claim cognizable under §1983, <u>see</u> <u>City of Canton, Ohio v.</u> <u>Harris</u>, 489 U.S. 378 (1989). Mere conclusory allegations of failure to train, however, are not enough; and the courts have generally held that there is no affirmative constitutional duty on the part of a supervising public official to train, supervise, or discipline subordinates so as to prevent constitutional torts, except where the supervisor has contemporaneous knowledge of an offending incident or knowledge of a prior pattern of similar incidents, and circumstances under which the supervisor's inaction could be found to have communicated a message of approval to the offending subordinate. <u>See</u> <u>Chinchello v. Fenton</u>, 805 F.2d 126, 133-34 (3 Cir. 1986). The Eleventh Circuit has held that nothing less than a showing of gross negligence is required to establish liability for inadequate training. <u>Cannon v. Taylor</u>, 782 F.2d 947, 951 (11 Cir. 1986). Moreover, the courts have required that the plaintiff must "identify a deficiency in a training program closely related to the injury complained of and must further show that the injury would have been avoided 'under a program that was not deficient in the identified respect.'" <u>Gordon v. Kidd</u>, 971 F.2d 1087, 1097 (4 Cir. 1992) (quoting <u>City of Canton</u>, <u>supra</u>, 489 U.S. at 391). Finally, in order to recover on a claim of failure to train, the plaintiff must show 1) that the [supervisor] failed to train, 2) that a causal connection existed between the failure to supervise or train and the violation of the plaintiff's rights, and 3) that such failure to supervise or train amounted to gross negligence or deliberate indifference. <u>Hinshaw v. Doffer</u>, 785 F.2d 1260, 1263 (5 Cir. 1986).

Plaintiff Thomas has not satisfied these requirements. He raises only unsupported and conclusory allegations of failure to supervise and failure to train, which is insufficient to state a constitutional claim. There is no allegation or showing of facts in his pleading to indicate that Pichardo had power or authority to

34

provide training to food service personnel employed by Trinity Food
Service, which was contracted by the DOC to provide meals to
inmates. With regard to corrections staff, Thomas alleges that
"Pichardo fail to ensure defendants Johnston, Rosado, Martell
receive effective training concerning [inmates with kidney
conditions]" (DE#49, ¶90). Thomas thus appears to argue that he
would not have received certain of his DRs if corrections staff had
been trained. It is his apparent belief that on 6/21/08, Rosado, a
Corrections Sergeant, if trained about diets, would not have told
him to sit and eat, when the tray had fruit instead of juice; that
on 10/6/08 in the supper line Martell would not have told him to
stop disrupting the line, when Thomas protested that his portions
were too small and demanded that a food worker show him the special
diet menu; and that on 10/10/08 his interaction/confrontation with
Martell would not have occurred if a regular diet tray had not been
delivered. This fails to recognize that it was Thomas' behavior on
those occasions that prompted issuance of the DRs. These claims
against Pichardo should be dismissed pursuant to §1915(e)(2)(B)(ii),
for failure to state a claim.

### 3.   Diet (Eighth Amendment)

Only disregard for prisoner's rights, which offends evolving
contemporary standards of decency and is repugnant to the conscience
of mankind, separates official conduct that is actionable under Sec-
tion 1983 from simple negligence which is not. When a plaintiff
fails to allege and show proof of such an abuse, what may be an ord-
inary tort does not rise to the level of a constitutional violation
actionable under §1983. Rhodes v. Chapman, 452 U.S. 337, 347 (1981);
Estelle v. Gamble, 429 U.S. 97, 106 (1976); Byrd v. Clark, 783 F.2d
1002, 1006 (11 Cir. 1986);  Hamm v. DeKalb County, 774 F.2d 1567,
1572 (11 Cir. 1985), cert. denied, 475 U.S. 1096 (1986); Williams
v. Bennett, 689 F.2d 1370, 1380 (11 Cir. 1982), cert. denied, 464
U.S. 932 (1983). Negligence, alone, cannot be a basis for recovery
under §1983. Davidson v. Cannon, 474 U.S. 344 (1986); Daniels v.
Williams, 474 U.S. 327 (1986); Estelle, 429 U.S. 97. The Eleventh
Circuit has held that to prevail on an Eighth Amendment claim for
damages under section 1983, in addition to the requirement that the
defendant must have acted under color of state law, a plaintiff must

prove three elements: 1) the infliction of unnecessary pain or suffering, Rhodes, 452 U.S. at 347; 2) deliberate indifference on the part of the defendant(s), Wilson v. Seiter, 501 U.S. 294, 302-03 (1991); and 3) causation, Williams, 689 F.2d at 1389-90. The first two elements of an Eighth Amendment claim, the 'objective' and 'subjective' elements, must both be satisfied. LaMarca v. Turner, 995 F.2d 1526, 1535 n. 17 (11 Cir. 1993) (citing Hudson v. McMillian, 503 U.S. 1 (1992)). While various conditions, alone or together, may make intolerable an otherwise constitutional term of imprisonment, Rhodes, 452 U.S. at 347; Ingraham v. Wright, 430 U.S. 651, 670 n.38 (1977); only unnecessary and wanton infliction of pain rises to the level of cruel and unusual punishment. Whitley v. Albers, 475 U.S. 312 (1986). The standard may be met if the state is deliberately indifferent to prisoners' basic necessities and fails to provide reasonably adequate food, clothing, shelter, and sanitation. Hamm v. DeKalb County, supra, 774 F.2d at 1572.

### Rosado, Martell, and Johnston

In this case, Thomas alleges that Rosado, Martell, and Johnston's issuance or approval of DRs "interfered with" his "renal diet." Specifically, Thomas asserts that his aforementioned interactions on three dates with kitchen and corrections staff led to issuance of DRs when he became upset about the food on his tray. These were 6/21/08, when Thomas complained to Rosado that substitution of fruit for juice was improper and received a DR for refusing to sit and eat; 10/6/08 when Thomas was charged with Disorderly Conduct for disrupting the food line when he argued that his food portions were too small, and demanded to see the special diet menu; and 10/10/08 when a regular food tray rather than his diet tray was delivered, which led to his DRs for Treats and Disrespect. As previously noted, Thomas has alleged that he didn't get to eat his 6/21/08 breakfast, because after the DR was issued he was escorted to confinement (AC) before consuming his food.

These allegations, against corrections officers, whose duties are not to treat inmates' medical conditions, or manage their dietary requirements, fail to demonstrate deliberate indifference

to plaintiff's medically related dietary needs; and at the very most appear to sound in negligence with regard to his apparent claim that they should be held responsible for getting him replacement food on three dates, and loss of breakfast on one of them (6/21/08). Accordingly, the claims against corrections officers Rosado, Martell, and Johnston concerning interference with diet should be dismissed under §1915(e)(2)(B)(ii).

### Jurado

Thomas also sues Dora Jurado, the ECI Food Service Director, for not following his prescribed medical diet.

Specifically, in the second amended complaint Thomas alleges he was on a medically prescribed diet on arrival at ECI on June 13, 2008; that on intake Dr. Balmir provided a pass for the diet to continue; and that he was supposed to be on the diet when he was at ECI from June 13 to October 24, 2008, and from February 20, 2009 to March 27, 2009 (DE#49, ¶¶9, 11, 12, 64).[14] Thomas alleges that because doctors put him on the "renal pre-dialysis kidney diet" the food service must be required to follow it, since failure to do so will result in injury. (Id., ¶60). He alleges that Jurado's failure to ensure he received the special diet caused his health and physical well being to deteriorate, and ultimately led him to seek dialysis. (¶61). He specifically alleges that although Jurado is provided a manual showing how to prepare a "medical prescribe renal pre-dialysis diet," she planned and served him food given on the regular inmate diet, contrary to the doctor's diet prescription order. Specifically, Thomas alleges that from 6/13 to 10/28/08, and from 2/20 to 3/27/09, "Jurado knowingly plain and serve foods not authorize by the doctor diet prescription order on my medical prescribe renal predialysis diet," and that during this "same time" he was "provided same foods served on the regular diet." (¶¶62-65). He contends that foods that should not have been served to him could not be

---

[14]     Although he omits the allegation from the second amended complaint, it is noted that in the First Amended Complaint Thomas states that Dr. Ortega renewed his diet pass on July 31, 2008. (DE#14, p.5). This is consistent with plaintiff's allegations in the ¶64 of the second amended complaint.

metabolized, causing him to loose weight, suffer muscle cramps
stomach pains, burning feet, head aches and insomnia." (§66-67).

Attached to the second amended complaint (DE#49, under Ex.A),
are various grievances by Thomas, directed to the food service,
which were responded to under Jurado's signature. A number of the
responses state that Jurado would look into the matter grieved.
Among the documents is a response to a June 2008 grievance with
mixed medical and dietary complaints, directed to the Warden, but
answered by Jurado, in which Jurado wrote: "Some of this issues
should be address to Med. department. Menus are provided to us by
Tallahassee (DOC) and we follow them." There are also responses from
Jurado indicating that "all diets are served [or 'served appropri-
ately'] according to the DOC diet menus." While these suggest that
Thomas received responses to his written dietary concerns, and that
diet menus may be controlled/provided by the DOC Central Office in
Tallahassee, and not by the institutional dietary staff, plaintiff
Thomas has alleged that Jurado knowingly and intentionally deviated
from the prescribed diet, causing him physical harm.

With respect to Ms. Jurado, the ECI Food Service Director, it
appears the second amended complaint should therefore be allowed to
proceed on a claim of failure to follow plaintiff Thomas's special
diet, medically prescribed to help manage a chronic renal condition.

(As to Ms. Jurado, service of process will be separately ordered,
in conjunction with entry of this Report).

### 4. Verbal Harassment

Thomas states that on 6/21/08, after the fruit substitution
incident and issuance of the DR by Rosado, he [Thomas] complained
to Johnston [about Rosado and his medical need for the juice instead
of fruit] and during the conversation Johnston, referring to Thomas'
kidney disease, commented "that's like having aids."  This fails to
state a cognizable claim against Johnston based on his comment about
Thomas' medical condition.  Verbal harassment does not state a claim
for relief in a federal civil rights action. See Hoptowit v. Ray,

682 F.2d 1237, 1252 (9 Cir. 1982)(federal court cannot order guards to refrain from using racial slurs to harass prisoners); <u>Burton v. Livingston</u>, 791 F.2d 97, 101 n. 1 (8 Cir. 1986)(use of racial slurs in prison does not offend Constitution); <u>McFadden v. Lucas</u>, 713 F.2d 143, 146 (5 Cir.), <u>cert. denied</u>, 464 U.S. 998 (1983)(threatening language and gestures). There are, however, recognized exceptions to the general rule, under which the conduct may rise to the level of a constitutional deprivation: for example, when verbal threats are accompanied by physical force or the present ability to effectuate the threat, <u>Harris v. Lord</u>, 957 F.Supp. 471, 475 (S.D.N.Y. 1997); <u>Jermosen v. Coughlin</u>, 878 F.Supp. 444, 449 (N.D.N.Y. 1995), or the person to whom the verbal abuse is directed is terrorized by threats accompanied by racial slurs, <u>Hopson v. Frederickson</u>, 961 F.2d 1374, 1378-79 (8 Cir. 1992); <u>Burton v. Livingston</u>, 791 F.2d 97 (8 Cir. 1986). Here Thomas has stated a cognizable constitutional claim in regard to the alleged comment. He has not shown any physical injury resulting from the alleged verbal harassment, and he has not shown that it was accompanied by any threats of violence or racial slurs. The claim should be dismissed pursuant to §1915(e)(2)(B)(ii).

### 5.  ADA Claims

Thomas alleges that defendants Jurado, Rosado, Martell, Johnston, and Pichardo violated his rights under the Americans With Disabilities Act ("ADA"). The Supreme Court has established that the ADA applies to inmates in state prisons. <u>Pennsylvania Dept. of Corr. v. Yeskey</u>, 524 U.S. 206, 209-210 (1998). Titles I and III of the ADA are inapplicable to a prisoner case such as this.[15] Title II of the ADA prohibits discrimination in services, programs, or activities of a "public entity" or "discrimination by any such entity." 42 U.S.C. §12132. "Public entity" is defined in the statute as:

---

[15]     Title I of the ADA prohibits employment discrimination, 42 U.S.C. §12112; and Title III of the ADA prohibits discrimination by public accommodations involved in interstate commerce such as hotels, restaurants, and privately operated transportation services, 42 U.S.C. §§12182, 12184.

(A) any State or local government;

(B) any department, agency, special purpose district, or other instrumentality of a State or States or local government; and

(C) the National Railroad Passenger Corporation, and any commuter authority (as defined in section 502(8) of Title 45).

42 U.S.C. §12131.  "Public entities" encompassed by Title II of the ADA include correctional facilities. Yeskey, supra. This section, however, clearly does not include individuals, Mason v. Stallings, 82 F.3d 1007, 1009 (11 Cir. 1996); Shotz v. City of Plantation, Fla., 344 F.3d 1161, 1172 (11 Cir. 2003); see also Alsbrook v. City of Maumelle, 184 F.3d 999, 1005 n.8 (8 Cir. 1999)(en banc), cert. dismissed, Alsbrook v. Arkansas, 529 U .S. 1001 (2000). Accordingly, the defendants Jurado, Rosado, Martell, Johnston, and Pichardo are not amenable to suit, and cannot be held liable for violations of Title II of the ADA, and as to them, on that claim, the operative complaint should be dismissed pursuant to §1915(e)(2()B)(ii).

### 6. Due Process Violations; Disciplinary Proceedings

Thomas complains about the 6/21/08 DR by Rosado for Refusing an Order to accept his tray with the fruit substituted for juice. He alleges that the DR was overturned on 9/9/08. Thomas' exhibits to the second amended complaint show that on the disciplinary sanction the DR was overturned (due to a technical error in processing, as reflected by Assistant Warden Perkins' 9/1/08 memo, DE#49, p.59), and that before it was overturned he had been sentence to 30 days in DC, with no loss of gain time.

Thomas claims that failure to process his 10/6 Disorderly Conduct DR issued by Martell, which had no hearing, caused him to remain in confinement for 32 days longer than he otherwise would have

on the sentences imposed for the 10/10 Threat DR [30 days DC] and the 10/10 Disrespect DR [30 days DC and 60 days loss of gain time].

In connection with the 10/10 DRs [which were a subject of the First Amendment retaliation claim(s) discussed in Section III above], plaintiff Thomas has also alleged that defendants Moles, Beck, Lafond, and Tate denied him due process because during the DR hearings he was not allowed to view videotapes as he requested. Tate was a reviewing Authority for both DRs. Beck and Moles were the hearing officers on the Threat charge; and Lafond and Beck were the hearing officers on the Disrespect charge.

Plaintiff Thomas' post hearing grievance documents related to the 10/10 DR for Spoken Threats indicate that the videotape evidence was considered by the DR Team. The grievance documents indicate that Thomas was told that inmates are not allowed to view videotapes, that they are reviewed by investigating officers who make findings and provide them to the hearing committee [DR team]; and that during his 10/14 Hearing on the 10/10 Threat charge Thomas was told that the video had no audio capability and did not support his statement; and his contention that Martell went to his cell twice, and was disrespectful had no bearing on his actions of threatening to kill him. See DE#49, pp. 71, 79].   In defense against the 10/10 DR for Disrespect, plaintiff Thomas complained that Pichardo who issued the DR was not at his cell long enough to hear what he said. Although plaintiff complains that he was not allowed to view the video at his Hearing, the Disciplinary Report paperwork submitted by the plaintiff with his complaint indicates that the hearing was postponed so that video could be examined for consideration (DE#49, p.69).[16]

---

[16]    As discussed supra in Section III of the Report, the contents of the video were investigated, and reported to the hearing team for its consideration, showing that Pichardo walked to Thomas' cell, briefly stopped, and then left the unit (DE#78-7, p.14).

Any possible claims related solely to the alleged denial of due process in the disciplinary process should be denied. There is no right inherent in the Constitution not to be placed in disciplinary segregation. Sandin v. Conner, 515 U.S. 472, 476 (1995). Therefore, because the plaintiff's allegations do not concern a right inherent in the Constitution, he must establish that he has a state-created liberty interest not to be confined to disciplinary segregation without being afforded due process. The Eleventh Circuit has interpreted the Sandin decision as recognizing two circumstances in which a prisoner can be further deprived of his liberty such that due process is required. The first is when a change in a prisoner's conditions of confinement is so severe that it essentially exceeds the sentence imposed by the court. See Sandin, 515 U.S. at 484. The second is when the state has consistently given a certain benefit to prisoners (for instance, via statute or administrative policy), and the deprivation of that benefit "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin, 515 U.S. at 484. In the first situation, the liberty interest exists apart from the state; in the second situation, the liberty interest is created by the state. Bass v. Perrin, 170 F.3d 1312, 1318 (11 Cir. 1999).

As a result of the Court's decision in Sandin, temporary confinement in disciplinary segregation does not mandate the due process procedures delineated in Wolff v. McDonnell, 418 U.S. 539, 558 (1974)(prisoners may not be deprived of statutory "good-time credits" without due process). Disciplinary segregation is not a "dramatic departure" from the ordinary conditions of confinement, nor is it a "major disruption in [a prisoner's] environment." Sandin, 515 U.S. at 485-86. Thus, under the authority of Sandin, a prisoner sentenced to a short term of disciplinary segregation has no protected liberty interest to which the due process protections apply. Because there is no right to procedural due process before the imposition of disciplinary segregation, neither the lack of due process nor any deficiency in procedure actually used is actionable in a §1983 action.

42

Insofar as Plaintiff Thomas may also be attempting to raise a claim based on the second <u>Sandin</u> circumstance, his complaint fails. <u>See, e.g.</u>, <u>Rodgers v. Singletary</u>, 142 F.3d 1252, 1253 (11 Cir. 1998)(affirming that two months' confinement to administrative segregation was not a deprivation of constitutionally protected liberty interest). On each of the four DRs [one on 6/21; one on 10/6; and two on 10/10/08, Thomas was sentenced to segregated confinement for no more than 30 days. This relatively short period of disciplinary segregation punishment is neither "atypical" nor a "significant hardship" under the <u>Sandin</u> analysis and is less than the 30-day punishment received by inmate Conner.

Moreover, as discussed above in this Report, insofar as he was deprived of 60 days gain time on the second of his two 10/10/08 DRs [Disrespect], a disciplinary conviction and sentence which has not been overturned, his claims regarding the punishment are barred by the landmark Supreme Court decision in the case of <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994), and <u>Edwards v. Balisok</u>, 520 U.S. 641 (1997). Accordingly, the due process claims relating to prison disciplinary proceedings should be dismissed pursuant to §1915(e)(2)(B)(ii).

### 7. Due Process; Grievance Procedures

Plaintiff Thomas further alleges denial of Due Process by Perkinds [sic, Perkins], and by Defendants Doe at RMC in Lake Butler where he was temporarily transferred for treatment, for their involvement in "disciplinary appellate review" [post-hearing grievance appeal proceedings].

Plaintiff Thomas cannot proceed on any claim that any of these defendants failed to act favorably on his grievances, complaints or letters.  The Constitution does not entitle prisoners and pretrial detainees in state or federal facilities to grievance procedures, <u>Adams v. Rice</u>, 40 F.3d 72, 75 (4 Cir. 1994), <u>cert. denied</u> 514 U.S. 1022 (1995); <u>Buckley v. Barlow</u>, 997 F.2d 494, 495 (8 Cir. 1993); <u>Flick v. Alba</u>, 932 F.2d 728, 729 (8 Cir. 1991); <u>Stewart v. Block</u>,

43

938 F.Supp. 582, 588 (C.D. Cal. 1996); Brown v. Dodson, 863 F.Supp. 284, 285 (W.D. Va. 1994); and since even if a grievance mechanism has been created for the use of states inmates the mechanism involves a procedural right, not a substantive one, and it does not give rise to a liberty interest protected by the Due Process Clause, Antonelli v. Sheahan, 81 F.3d 1422, 1430 (7 Cir. 1996); Hoover v. Watson, 886 F.Supp. 410, 418 (D. Del. 1995); Brown v. Dodson, supra at 285; and thus, if the state elects to provide a grievance mechanism, violations of its procedures, or even a failure to respond to the prison grievance, do not give rise to a §1983 claim, Buckley v. Barlow, supra, 997 F.2d at 495; Hoover v. Watson, supra, 886 F.Supp. at 418-19. When the claim underlying the administrative grievance involves a constitutional right, the prisoner's right to petition the government for redress is the right of access to the courts, which is not compromised by the prison's refusal to entertain his grievance. Flick v. Alba, supra, 932 F.2d at 729. The due process claims relating to Florida's inmate grievance procedure should be dismissed pursuant to §1915(e)(2)(B)(ii).

Moreover, if not subject to dismissal under §1915(e), claims against the unnamed defendants John Doe would be subject to dismissal pursuant to Fed.R.Civ.P. 4(m), which provides for dismissal of a complaint which has not been served within 120 days of its filing.

## V.  CONCLUSION

It is therefore recommended that: 1) the motion for summary judgment (DE#78) filed jointly by the defendants Pichardo, Johnston, and Martell, on the claims of First Amendment retaliation and related conspiracy, be GRANTED as to all defendants; 2) upon screening of the remainder of the claims raised in the Second Amended Complaint DE#49, all claims against the defendants Pichardo, Johnston, Rosado, Martell, Balmir, Moles, Beck, Lafond, Perkinds [Perkins], Tate, and defendants John Doe, be dismissed pursuant to 28 U.S.C. §1915(e)(2)(B)(ii), for failure to state a claim upon which relief may be granted; and 3) the case remain pending solely against the defendant Dora Jurado, the ECI Food Service Director, on the claim that from June 13 to October 24, 2008, and again from

44

February 20, 2009 to March 27, 2009, she failed to provide plaintiff Thomas with his medically prescribed diet.

Objections to this report may be filed with the District Judge within ten days of receipt of a copy of the report.

Dated: 2nd day of June, 2010.

_____
UNITED STATES MAGISTRATE JUDGE

cc:  Rodney Thomas, Pro Se
     DC# 064676
     Everglades Correctional Institution
     P. O. Box 949000
     Miami, FL 33194-9000

     Jennifer L. Carman, Esquire
     Assistant Attorney General
     OFFICE OF THE ATTORNEY GENERAL
     110 S.E. 6TH Street
     9th and 10th Floor, Republic Tower
     Fort Lauderdale, FL 33301-5000